723 So.2d 939 (1998)
STATE of Louisiana
v.
James TYLER, III.
No. 97-KA-0338.
Supreme Court of Louisiana.
September 9, 1998.
Rehearing Denied November 20, 1998.
*941 Jerome M. Winsberg, Michael Jay Winsberg, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Paul Carmouche, District Attorney, Hugo A. Holland, Jr., Catherine M. Estopinal, Shreveport, for Respondent.
LEMMON, Justice. [*]
This is a direct appeal to this court from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues on appeal are (1) whether the trial court erred in sustaining the prosecutor's objection to defendant's peremptory challenges of two prospective jurors under Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), which held that a criminal defendant may not exercise a peremptory challenge to exclude a prospective juror on the basis of race; and (2) whether the conviction or sentence must be reversed because of the improper introduction of other crimes evidence.[1]

Facts
On May 29, 1995, defendant shot and killed the manager of a fast food restaurant in the course of an armed robbery. He also shot two other employees in the head, but they survived the injuries.
The day after the shooting, defendant's girlfriend informed the police that defendant told her he had committed the robbery and murder. According to the girlfriend, defendant could not understand how the other victims survived because he shot them in the head.
Several days later, one of the surviving victims picked defendant out of a line-up at the police station, and the other victim tentatively identified defendant as the person who *942 had shot him. At trial, both victims positively identified defendant as the perpetrator.
Upon his arrest, defendant gave an equivocal statement in which he both offered to sign a confession if the police would write it and claimed he was too impaired by drugs to remember anything about the day or night of the crime. He also told the officers that he was wanted for a shooting in Missouri.
Jury selection lasted for seven days. The guilt phase was essentially uncontested by defendant, and the jury found him guilty as charged. After a three-day penalty phase, the jury recommended the death sentence, finding as aggravating circumstances that defendant killed the victim while engaged in the perpetration of an armed robbery and knowingly created the risk of death or great bodily harm to more than one person. This appeal followed.

Peremptory Challenges

1. Objections to Peremptory Challenges by the Defense

In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court held that the equal protection provision of the Constitution prohibits a prosecutor's exercise of a peremptory challenge in the trial of a black criminal defendant to exclude a black prospective juror on the basis of the juror's race. See also La.Code Crim. Proc. art. 795. In the analysis outlined by the Court, the defendant who objects to a peremptory challenge first must establish a prima facie case of discrimination by the prosecutor. Upon such a showing, the burden shifts to the prosecutor to offer a racially neutral explanation for the challenge. Batson, 476 U.S. at 97, 106 S.Ct. 1712. The trial judge then has the duty to determine whether the defendant has established purposeful racial discrimination. Id. at 98, 106 S.Ct. 1712.
The Court has extended the Batson prohibition of racially discriminatory peremptory challenges in other contexts. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court held that the prosecutor in the trial of a white criminal defendant is prohibited from excluding black jurors on the basis of race. In Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Court held that private litigants in a civil case cannot exercise peremptory challenges in a racially discriminatory manner. In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Court, focusing on the protection of prospective jurors from discrimination in violation of their right to equal protection of the law, held that a criminal defendant may not use peremptory challenges in a racially discriminatory manner.
After the McCollum decision, which involved a white defendant's striking black venire persons, this court in State v. Knox, 609 So.2d 803 (La.1992), interpreted McCollum to apply when a black criminal defendant challenges a white venireman and held that the McCollum rationale prohibits black defendants from exercising peremptory challenges to exclude white prospective jurors.
Under the Batson analysis, as applicable also to peremptory challenges by the defense under McCollum and Knox, the ultimate burden of persuasion remains on the party objecting to the challenge to prove purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(per curiam); Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The trial judge ultimately determines whether the proffered race-neutral reason is plausible, persuasive or substantiated by the record. State v. Green, 94-0887, p. 9; 655 So.2d 272, 289 (La.1995). "[T]he proper inquiry in the final stage of the Batson analysis is not whether the [challenger] has disproved the existence of purposeful discrimination suggested by the [opponent's] prima facie case; rather, the question is whether the [opponent's] proof, when weighed against the [challenger's] proffered `race-neutral' reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present." Green at 29; 655 So.2d at 290. The ultimate focus of the Batson inquiry is on the challenger's intent at the time of the strike. Green at p. 2; 655 So.2d at 287. The trial court should examine all of the evidence available. Patterns of strikes and other statements or actions by the challenger during *943 the voir dire may support a finding of discriminatory intent. Green at 24; 655 So.2d at 288. See also State v. Thompson, 516 So.2d 349, 353 (La.1987) (quoting from Batson).
Whether there has been intentional racial discrimination is a question of fact. Hernandez, 500 U.S. at 364, 111 S.Ct. 1859. A reviewing court should afford great deference to the trial judge's evaluation of discriminatory intent and should not reverse unless the evaluation is clearly erroneous. Hernandez, 500 U.S. at 364, 111 S.Ct. 1859. As the Court in Batson explained: "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, 106 S.Ct. 1712.

2. Peremptory Challenges of Jurors Berry and Pietrzykowski

At issue in the present case is the prosecutor's objection to defense counsel's exercise of peremptory challenges against prospective jurors Faircloth, Owen, Berry and Pietrzykowski. Defense counsel contends that the trial judge erred in maintaining the objections to the latter two jurors.
Five days into jury selection, the parties had accepted five white jurors and two black jurors.[2] The defense had used five of its twelve peremptory challenges, four against white males[3] and one against a black female [4]. At that point defense counsel made an unsuccessful Batson objection when the prosecutor struck a black female. Then the prosecutor made a McCollum objection when defense counsel struck a white male. As race-neutral reasons for the challenge, defense counsel stated that the white male appeared hesitant about returning a life sentence and was otherwise preoccupied with the impact of lengthy jury service on his business. The judge overruled the prosecutor's McCollum objection and allowed the defense to exercise its sixth peremptory challenge.
Thereafter, the trial judge, recognizing that the jury panel would not be sufficient to provide the necessary twelve jurors and alternates, ordered the members of the jury venire from another division of court, who had been dismissed from service in that division, to report for service in the present case.[5] Defense counsel at the outset expressed his dissatisfaction with the racial composition of the tales jurors, objecting on the grounds that the venire was primarily white and therefore did not represent a fair cross-section of the parish. Defense counsel also commented that no one knew the reasons for dismissal of the jurors from the other division. The trial judge overruled the objection, and the tales jurors from the other division were brought in for voir dire.
All five of the tales jurors in the first group called for voir dire, which included the *944 four jurors at issue here, were white. Both sides questioned the jurors extensively on many issues, including their attitudes toward the death penalty and their willingness to consider both death and life sentences. After the questioning, the prosecutor challenged one tales juror for cause based on her attitude toward capital punishment. The judge agreed with the prosecutor and excused that juror, but denied two defense cause challenges against Owen and Faircloth. Court was then adjourned for the day.
The next morning, voir dire resumed with the same group of four prospective jurors. After the prosecutor concluded his examination, defense counsel quickly concluded his examination and then exercised peremptory challenges to strike all four white panelists.
The prosecutor made a McCollum objection on the basis that the challenges of all four white jurors constituted a prima facie showing of racial discrimination. Ruling that the burden had shifted, the trial judge ordered defense counsel to provide race-neutral reasons for the challenges. Defense counsel explained that the four prospective jurors were all "pro death," pointing out that the jurors indicated they would have difficulty returning a life sentence, and he rested on the totality of the record. The prosecutor responded that the seven jurors already accepted were "pro death because they can return a death penalty," arguing that "we are not going to have anybody up here that is not pro death."
The trial judge, pointing out that all four jurors stated they could recommend a sentence of life imprisonment according to the circumstances, asked the defense to provide further explanation of the reasons underlying the challenges. Defense counsel then stated, "Your honor, basically our reason is very simple. All these jurors are leaning toward death. And that's our only reason."
The trial judge then accepted the race-neutral explanation as to Owen and Faircloth, based upon their answers, and he allowed defense counsel's peremptory challenges and excused those jurors. Pointing out that there were "degrees" of death penalty leanings, the judge noted that Owen's leaning was the "strongest one" and Faircloth's leaning established "at least some neutral reason" for the challenge. However, the judge ruled that the use of peremptory challenges on Berry and Pietrzykowski constituted a Batson-McCollum violation. The judge therefore rejected the peremptory challenges and seated Berry and Pietrzykowski on the jury. Expanded reasons for the ruling were later provided as follows:
We think that Defense Counsel did not give us an adequate, rational basis for those and although [defense counsel] felt they could stand on the record, I think the record will speak for itself.
It's difficult for the Court to give a Batson challenge; however, in this case, I have no other alternative. I feel like the scratches were made for a racially made basis. I think the arguments of Counsel about this jury coming in were racially made and a part of the reasons these people were excluded. The record will reflect that they objected to the second jury coming in because there were more white people than black people. And from that, we see Defense Counsel excluding all the white people that were in the box. (emphasis added).

3. Analysis of the Trial Judge's Rulings

During voir dire questioning as to opinions about the death penalty, Juror Faircloth opined that "a person ought to get what he give[s.]" While he stated that he could impose a life sentence, depending on the circumstances, for a rape and murder or for a bank robbery and murder, he conceded he strongly agrees with the death penalty.
Juror Owen stated that she believes in the death penalty and could recommend it for several mass murderers mentioned by the prosecutor. When asked if she could consider mitigating circumstances, she first quoted the scriptural "eye for an eye" language. However, she answered affirmatively about her willingness to recommend a life sentence under appropriate circumstances, adding that she was "more turned the other way" and probably would have difficulty, but would "have to hear the evidence."
*945 Faircloth and Owen were not challengeable for cause because they stated they could recommend life imprisonment in hypothetical situations postulated by the prosecutor and their attitude toward the death penalty apparently would not prevent or substantially impair them from making an impartial decision as a juror in accordance with their instructions and their oath. La.Code Crim. Proc. art. 798(2)(b). However, they expressed strong feelings favorable to the concept of capital punishment, as noted by the trial court in denying the cause challenges against these two. Their attitude toward the death penalty therefore strongly supported the race-neutral reasons furnished by defense counsel after the prosecutor objected on Batson-McCollum grounds to the peremptory challenges.
On the other hand, Juror Pietrzykowski, although stating in voir dire that he "believe[s] in the death penalty, but it really depends on the facts of the case," emphasized that he would want to know and understand all of the facts before deciding on a recommendation. In a final question concerning the effect on his decision of information about the commutation power of the governor, he answered he "absolutely" could still recommend a life sentence in a capital case and would respect any decision by the governor after he himself had been confronted with this very difficult decision.
While Pietrzykowski believed in the death penalty as appropriate punishment in certain cases, he hardly could be characterized as "pro death," the term used by defense counsel as the sole race-neutral reason for the peremptory challenge.[6] His perception of the need for knowledge of all the facts and of a juror's awesome responsibility in making this difficult decision clearly supported the trial court's decision that defense counsel's peremptory challenge of Pietrzykowski was racially motivated and that the race-neutral reason was pretextual.
The decision regarding Juror Berry presented a closer question. In voir dire Berry first stated his belief that "the death penalty is appropriate for some crimes" and agreed that the penalty is definitely appropriate for mass murderers named by the prosecutor and probably appropriate for a rape and murder. The following exchange then took place:
Q. Would you also be able to consider a life sentence depending on what evidence you might hear at the sentencing phase if you got that far?
A. I can't contemplate what that would be right now that make that would make me change my mind.

Q. Change your mind from what?
A. That the person should get the death penalty like in the case you represented about he raped somebody and murdered them right after that.

Q. Would you like me to give you some examples of things that you might hear at the penalty phase which the judge would tell you you should consider in making that decision?
A. (Nods head up and down)
Q. The judge will tell you that there arethere's a list that our legislature has provided of mitigating circumstances. The judge will also tell you that that list is illustrative and not exhaustive. Several of those mitigating circumstances are as follows, or could be: The youth of the offender at the time of the offense. Teenager versus a mature person such as yourself. The fact that the offender was under the domination or control of somebody else at the time. Of Mice and Men kind of thing, if you know what I am talking about. Steinbeck's book.
A. (Nods head up and down)
Q. Another mitigating circumstances might be that at the time of the commission of the offense, even though the offender knew the difference between right and wrong, he was suffering from some mental disease or defect which caused his thinking process to not be what a regular person's thinking process is. Those are the sort of things and again only an illustrative list that I have just provided, of things that you very may well here [sic] at a sentencing *946 phase. Mitigating circumstances being reasons for you and the jurors to consider in not imposing the death penalty. I have given you have a couple of examples. If you were chosen to sit on the jury and you did reach the penalty phase, would you consider those sort of things, especially if the judge orders that you must consider them?

A. Yeah, I think that would be reasonable.

Q. Now, let's go one step further than that. To consider something means not only to be able to have it in your mind but have it in your heart as well. So when I ask each of you if you could consider a death penalty, I'm asking if you could come back in court and tell somebody they have to be executed for what they did?
A. No.
Q. When I ask you if you can consider mitigating circumstances, I am asking you can you not only consider them and think about them, but come back in court and tell a person who has committed a first degree murder, you have to go to jail the rest of your life for what you did.
A. (Nods head up and down)
Q. Now that we've gone into that, I know what your feelings are about the death penalty. Could you consider a life sentence as well? Not knowing anything about the facts of the case, are you open to both possibilities?

A. I believe I could. Obviously it's not something I would want to do to either one of those cases. I don't relish having somebody's life in my hands, but I believe I could render either one of those, yes. (emphasis added).
Thus, Berry, after an initial negative reaction to mitigation, willingly listened to and accepted examples of mitigating circumstances, and he later stated that he would want to know as much as possible about the crime as well as about the accused, such as mental capacity and other reasons he should not be given the death penalty. Berry concluded by stating that while the death penalty is "appropriate for some crimes," he could consider and impose a life sentence, as well as a death sentence, in a capital case in which he was selected to serve on the jury. He further asserted that knowledge of the governor's commutation power "would not have any bearing on my opinion" as to a life sentence.
The basic theme of the Batson analysis for determining the validity of an objection to a racially motivated peremptory challenge was to require the objecting party to establish a prima facie showing of racial discrimination and to allow the party exercising the challenge to explain the reasons other than race which motivated the challenge, and then to trust to the good judgment and fair-mindedness of the trial judge the determination of whether the objecting party has established purposeful racial discrimination. Batson, 476 U.S. at 97-98, 106 S.Ct. 1712. Recognizing the variety of jury selection practices across the nation, the Court declined to instruct the state and federal trial courts on how best to implement the required analysis, but emphasized that the trial judge's findings in the context of such a determination of purposeful racial discrimination will turn on evaluation of credibility and ordinarily must be accorded great deference. The Court thus recognized both the constitutional necessity of prohibiting purposeful racial discrimination in the selection of jurors and the difficulty of administering the prohibition.
This court, subsequent to Batson, also recognized the sensitive role of the trial judge in protecting against purposeful racial discrimination during the supervision of voir dire under the Batson guidelines. In State v. Collier, 553 So.2d 815 (La.1989), this court reversed the overruling of a Batson objection because the trial judge simply accepted the prosecutor's explanation for his challenges, which were facially neutral, without assessing the weight and credibility of the explanation. Indeed, Collier is the only case since Batson in which this court overturned a trial judge's ruling on a Batson or McCollum objection to a peremptory challenge, and the Collier holding was supported by unusual inconsistencies in the reasons given by the prosecutor for the peremptory challenges.
The decisive question in the Batson analysis is whether the race-neutral explanation *947 should be believed. Hernandez, 500 U.S. at 365, 111 S.Ct. 1859. In the present case, a juror's leaning toward the death penalty, of course, is a race-neutral reason. However, the voir dire responses of Berry and Pietrzykowski showed that their attitudes toward capital punishment fell far short of justifying a cause challenge and also indicated that the proffered race-neutral reason could be viewed as a pretext for discrimination. The trial judge reasonably surmised that defense counsel struck the entire group of four white jurors out of dissatisfaction because the tales jurors from the other court were mostly white and in hope of obtaining more black persons in the next group called for voir dire. Earlier complaints by defense counsel regarding the race of jurors, plus previous Batson and McCollum challenges by each side, showed that racial animus infected the voir dire and were reasonably seen as indicators of defense counsel's intent to remove these white prospective jurors because of their race. The trial judge carefully considered the matter and made a thoughtful decision based on his perceptions of the motivation of defense counsel during the lengthy voir dire.
In view of the vast amount of deference to be accorded to the findings of the trial judge in this context, we cannot say that the trial judge was clearly wrong in choosing not to believe the race-neutral explanation and in ruling that purposeful racial discrimination motivated the peremptory challenges.

Other Crimes Evidence
Defendant argues that the trial court erred by allowing a witness for the prosecution to testify during the guilt phase about defendant's arrest for distribution of cocaine in May 1995.
Before trial, the defense filed a motion to prohibit the use of other crimes evidence and for a Prieur hearing. The defense argued that evidence of other crimes, including the drug deal which the police orchestrated to arrest defendant and take him into custody, was not admissible. The court ruled that the evidence of the drug sale was admissible. At trial, three agents and defendant's girlfriend testified about the arrangements for the drug sale and gave the details of the sale.
The prosecutor argues that evidence of the drug deal was properly admitted because the conduct formed part of the res gestae under La.Code Evid. art. 404B, and the evidence was necessary to present its case accurately and to complete the story of the crime. However, the murder and the drug deal were two distinct crimes. The drug deal did not take place until twenty-four hours after the murder. There was no evidence to suggest that defendant engaged in behavior in the interim which would make the drug deal, initiated by the police, a continuation of the earlier offense. While the police used the drug deal to arrest the defendant for the murder, evidence of the "sting" completes the picture of the arrest, not the robbery and shooting. Therefore, the evidence was not properly admissible as res gestae evidence.
Moreover, the evidence was not admissible for other legal purposes such as to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake. La.Code Evid. arts. 403, 404 B(1). Evidence of other crimes is not admissible simply "to prove the character of a person in order to show that he acted in conformity therewith." La.Code Evid. art. 404 B(1). It must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Hatcher, 372 So.2d 1024, 1033 (La.1979); State v. Sutfield, 354 So.2d 1334 (La.1978). Consequently, the trial court erroneously permitted the state to introduce evidence of the drug deal in the guilt phase.
Nevertheless, any error was harmless, given the evidence introduced against the defendant at trial. See State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94 (erroneous admission of other crimes evidence is subject to harmless error analysis under the Chapman standard); State v. Gibson, 391 So.2d 421 (La.1980) (adopting harmless error analysis announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
Defendant's girlfriend testified that defendant, on the night of the murder, indicated that he committed the crime, and the next *948 day, after watching the news, he described how he shot each of the employees in the back of the head. One of the surviving victims testified that the perpetrator forced them to lie down in the freezer and shot each of them in the back of the head. She picked defendant out of a line-up a couple of days after the incident and identified him in court. In addition, the other surviving victim also identified the defendant in court as the man who robbed and shot them.
On this evidence, one can reasonably conclude beyond a reasonable doubt that the jury "actually rested the verdict" on the evidence properly introduced by the prosecutor rather than on the improper references to "other crimes." Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). See also Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State v. Sanders, 93-0001 (La.11/30/94); 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
Defendant further argues that the prosecutor committed reversible error in the penalty phase by referring to other crimes evidence during the cross-examination of Dr. Cecile Guin, the social worker expert for the defense, in violation of La.Code Crim. Proc. art. 770(2) and by failing to give notice of his intention to introduce the other crimes evidence.
During cross-examination, the prosecutor questioned Dr. Guin regarding her contention that defendant would do fine in a structured correctional environment such as a prison. In the course of questioning, the prosecutor showed Dr. Guin an object and asked:
Q: Dr. Guin, have you ever seen anything like this before (indicating)?
A: Looks like a screw to me. I don't know.
Q: Doesn't that look lie [sic] a sharpened screw. If I told you that was a shank, would you know what that is?
A: I have heard the term "shank"?
Q: What's a shank?
A: I've heard the term in prison that they would takeoffenders would take forks or things like that from the dining hall and make knives out of them.
Q: Would it surprise you to learn that that shank was found in James Tyler's cell hidden on August 13, 1996?
A: No. It's consistent with his behavior his whole life.
When Dr. Guin indicated that she did not think that defendant would hurt a prison officer with the shank, the prosecutor asked whether she was familiar with the incident in St. Louis "where he had to be restrained by one of the guards when he was incarcerated for the rape and for possession of cocaine and he threatened to kill him, and I think he called him a honky motherfucker and threatened to kill him?"
In the bifurcated sentencing phase of a first degree murder trial, the character of the defendant is automatically at issue, whether the defendant has placed his character at issue or not. Sawyer v. State, 442 So.2d 1136 (La.1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984); State v. Jackson, 608 So.2d 949, 953 (La.1992); La.Code Crim. Proc. art. 905.2. Evidence of unadjudicated other crimes is relevant and probative of the defendant's character and propensities. Jackson, 608 So.2d at 954-56.
Normally, notice and a determination by the trial court that the evidence is admissible are required before evidence of unadjudicated crimes is permitted. Id. at 955. However, these evidentiary limitations are not applicable to the prosecutor's case in rebuttal. Id. at 957. If the accused introduces evidence in the penalty phase relating to his good character or lack of criminal history, the prosecutor may introduce appropriate and relevant rebuttal evidence. Id. at 954, n. 6. Moreover, cross-examination is an appropriate manner of eliciting testimony which rebuts evidence of the defendant's character given on direct. State v. Sepulvado, 93-2692, p. 14 (La.4/8/96); 672 So.2d 158, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).
Rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse *949 party. State v. Davis, 411 So.2d 434 (La. 1982). In the present case, the evidence of the contraband shank, discovered just weeks before trial while defendant was in jail and taking his medication, contradicts Dr. Guin's statement that he would do "fine" in a structured environment such as prison. In addition, once she stated her expert opinion that defendant would not use the shank to attack a guard, she opened the door to evidence that he had attacked a guard in the past. Consequently, the evidence of the other crimes was properly elicited.

Capital Sentence Review
This court reviews every sentence of death imposed by courts of this state to determine if it is constitutionally excessive. La.Code Crim. Proc. art. 905.9; La. S.Ct. R. 28. The court considers (1) whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; (2) whether the evidence supports the jury's findings with respect to statutory aggravating circumstance; and (3) whether the sentence is disproportionate, considering both the offense and the offender.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that defendant is a black male born on April 26, 1976. He was nineteen years old when he committed the murder. He is unmarried and has no children or other dependents. He is the only child born to Marcia Tomlin Tyler and James S. Tyler, Jr., together, but he has one half -brother and one half-sister His parents divorced when defendant was approximately seven years old. His father, by his own admission, did not spend much time with defendant. When defendant was in the third grade, his mother sent him to California to live with his father because she could no longer handle him. Defendant continued to have behavior problems in California and was expelled from school because of negative attention-seeking behavior, threatening other children, and eventually exposing himself sexually to peers. After being expelled from school, he had babysitters for brief periods, but they could not tolerate his behavior, and he spent much time without supervision while his father worked.
At age ten defendant was admitted for his first in-patient evaluation for conduct problems, chronic difficulties with peer relationships, and chronic school adjustment problems. Before this time, he had been admitted on an outpatient basis, and testing showed an inability to differentiate between minor and major consequences. He appeared overwhelmed by internal rage and showed few coping mechanisms. The summary of his in-patient evaluation indicated that defendant was generally capable of average intellectual functioning. The evaluation showed that he had had problems in behavior beginning when he was in kindergarten; even then, he would steal and lie. He asked his mother once as a young child if he were retarded and informed her that he heard voices that told him to do bad things. After defendant was expelled from school in California, he went to the Centinela Child Guidance Clinic for evaluation and was admitted for in-patient treatment. His discharge diagnosis was schizotypal disorder and atypical conduct disorder. He was discharged on the medication Mellaril. Subsequently, he performed good to fair in school in academic subjects, but his behavior was still poor. He has an IQ between seventy and one hundred, which places him in the "medium" intelligence range.
A psychiatric evaluation revealed that defendant suffers form mild to moderate psychopathic behavior and extreme borderline personality disorder. The evaluation also indicated that defendant was able to distinguish right from wrong at the time of the offense, was able to adhere to the right, and was capable of cooperating in his defense.
Defendant does not have any previous convictions as an adult, but he was under the order of the St. Louis Juvenile System for rape, possession of controlled substance, and unlawful use of a weapon, according to Boys Town, Missouri.

1. Passion, Prejudice, and Other Arbitrary Factors

Defendant asserts that passion, prejudice, and arbitrariness tainted the proceedings *950 when: (1) other crimes evidence was admitted; (2) prosecution witness Hopson displayed his shooting scars to the jury; (3) the trial court permitted the prosecutor to present unnecessary evidence of the prior shooting and attempted robbery; (4) the trial court allowed the prosecutor to introduce the photographs of Angola without prior notice and did not grant the defense a reasonable recess to present countervailing evidence; (5) the trial court permitted testimony of prosecution witnesses regarding defendant's arrest for distribution of cocaine on May 30, 1995; and (6) the trial court allowed improper remarks by the prosecutor in his rebuttal argument to the jury during the penalty phase. All of the factors except the last one have been treated above or in the appendix, and do not present grounds for reversal.
Defendant argues that the prosecutor's rebuttal closing was prejudicial. The prosecutor attacked the credibility of the defense's experts by arguing that they were paid as experts to testify. Defendant complains specifically about the following remarks made by the prosecutor during rebuttal argument:
Mr. Holland: What the Defense is asking is that you give mercy to James Tyler. They are asking tediously through their paid experts
Mr. Golden: Objection.
The Court: Objection overruled.
Mr. Holland:Dr. Guin, Dr. Johnson, Dr. Ware, paid experts. There is not one person the State called to the stand that was paid. The State called witnesses to the stand to tell you what they knew and to tell you the truth.
Dr. Ware and Dr. Guin and Dr. Johnson and Burk Foster testified in this first degree murder case as they do in most first degree murder cases
Mr. Golden: Objection; that implies outside knowledge.
The Court: Objection overruled.
Mr. Holland: As I said, Dr. Ware, Burk Foster, Dr. Guin, and Dr. Johnson testified in this case as they have in other first degree murder cases that you should excuse this conduct because there is some mental problem with the person that you have already convicted of first degree murder.
I am not going to bore you in reiterating those arguments or any counter arguments.
What you've got to decide is that those excuses given to you by those paid witnesses are sufficient to not do what I think you know to be your duty....
The defense objected and now contends that the prosecutor's argument was misleading and prejudicial.
Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. La. Code Crim. Proc. art. 774. Prosecutors enjoy wide latitude in choosing closing argument tactics. See State v. Martin, 539 So.2d 1235 (La.1989); State v. Copeland, 530 So.2d 526 (La.1988). The trial judge has broad discretion in controlling the scope of closing arguments, and this court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. State v. Prestridge, 399 So.2d 564, 580 (La.1981); State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, 200.
Because defense experts were in fact paid for their evaluations and testimony, it was not improper for the prosecutor to argue that to the jury. While it was somewhat misleading for the prosecution to suggest that its experts were not paid, the statement was not so damaging as to contribute to the verdict.
Accordingly, we conclude defendant's sentence was not the result of passion, prejudice, or any other arbitrary factors.

2. Aggravating Circumstances

At trial the prosecutor argued two aggravating circumstances: (1) the offender was engaged in the perpetration of an armed robbery; and (2) the offender knowingly created a risk of death or great bodily harm to more than one person. The jury found the *951 existence of both circumstances. The testimony of the surviving victims fully established that defendant robbed them at gunpoint and shot them and the deceased victim in their heads.

3. Proportionality Review

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration regarding excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979).
Since 1976, jurors in the First Judicial District have returned a guilty verdict for a first degree murder charge in twenty-five cases, including this case, and imposed the death penalty on six occasions before this case. Two of those six cases involved murders committed during the perpetration of an armed robbery. See State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359; State v. Ford, 489 So.2d 1250, 1264 (La.1986), vacated on other grounds, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987). On a statewide basis, this Court has consistently affirmed death penalties in other cases involving killings during armed robberies.[7] In Davis, the defendant shot and killed a convenience store employee while robbing the store. The next evening, a defendant shot to death a service station employee during an armed robbery. In Ford, another jury sentenced the defendant to death for an armed robbery-murder of an elderly jeweler. The victim was shot once through the head.
In the present case defendant shot the murder victim twice in the head, and shot two other victims in the head, one of them twice and all at close range. A comparison with other similar cases indicates that the death penalty is not disproportionate in this case.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until either (a) defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari and either (i) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.
NOTES
[*] Victory, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] The clerk of court kept a tally sheet during jury selection, and the judge ordered the information filed into the record at the close of voir dire for purposes of appellate review. La.S.Ct.R. 1, § 6(b) provides that records on appeal in criminal cases shall contain, inter alia, a "list of challenges for cause, list of peremptory challenges, list of petit jurors selected...." This list provides a valuable guide to the course of jury selection in this case.
[3] The reasons offered by defense counsel were: The first white male juror "had a serious problem when I asked him about commutation" and "seemed more inclined to give a death penalty." The second was only eighteen, "seemed hesitant," "hasn't had a lot of life experience." The third had "hesitancy about a life sentence" and "skepticism about psychiatrists' testimony." The fourth said he "had a tendency to go along with the other jurors."
[4] The black female juror's views toward capital punishment and toward voluntary intoxication as a defense to a specific intent crime inclined both sides to excuse her. The court charged a peremptory challenge to each side.
[5] "In a parish other than Orleans having more than one division of court, holding petit jury terms simultaneously, when a petit jury venire of one division is or is about to be exhausted before a trial jury is impaneled, the judge of that division, with the consent of the judge of the division that has not exhausted its petit jury venire, may order the petit jury venire of the latter division or such portion thereof not being used by the latter division, to report to his division to serve as tales jurors." La.Code Crim. Proc. art. 785 A.
[6] The prosecutor certainly spoke overbroadly in asserting that a juror must be "pro death" to be qualified to serve on the jury in a capital case, and equated "death qualified" to "pro death."
[7] E.g., State v. Lindsey, 428 So.2d 420 (La.1983); cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246; State v. Mattheson, 407 So.2d 1150 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412; State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983); State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247; State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Messiah, 538 So.2d 175 (La. 1988).