807 So.2d 208 (2002)
STATE of Louisiana
v.
Daniel T. IRISH.
No. 2000-KA-2086.
Supreme Court of Louisiana.
January 15, 2002.
Rehearing Denied February 22, 2002.
*209 Kris N. Finley, Stephen A. Glassell, Shreveport, R. Neal Walker, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Paul Carmouche, District Attorney, Catherine M. Estopinal, Ross S Owen, Jason W. Waltman, Shreveport, Counsel for Respondent.
VICTORY, Judge.[*]
On February 13, 1997, a Caddo Parish grand jury indicted the defendant, Daniel Irish, with one count of first degree murder in violation of La. R.S. 14:30. A jury found the defendant guilty as charged, and after a sentencing hearing, unanimously recommended a sentence of death based on the aggravating circumstance that the offender was engaged in the perpetration or attempted perpetration of an armed robbery. La.C.Cr.P. art. 905.4(A)(1). The defendant now appeals his conviction and sentence, raising 15 assignments of error.[1]

FACTS
In December 1996, the then 18-year-old defendant and his 17-year-old girl friend, Kristee Kline, were living in a mobile home owned by Russ Rowland, a local building contractor. Because the defendant and Kline were unemployed, they had not paid their rent for two months and thus owed Rowland $500.00. In addition, they had numerous overdue bills and recently had their phone service disconnected. Faced with financial hardship, the defendant often talked about robbing and killing someone with a lot of money. Approximately three days before the instant *210 offense, the defendant told Kline and friends Audy Keith and Jason Guin that he wanted to rob and kill Rowland. The defendant informed them that he planned to lure Rowland to the trailer, kill him, and dispose of the body in a nearby swamp. On the morning of December 30, 1996, the defendant went to Rowland's office and asked Rowland to come to the trailer to collect the overdue rent. Rowland arrived shortly thereafter, but the defendant did not follow through with his plan and instead told Rowland that he had misplaced his checkbook and asked Rowland to come back that afternoon. Later that day, while driving home from a local Wal-Mart store with Kline, Keith and Guin, the defendant reiterated his need for money and his intent to rob and kill Rowland. The defendant stopped at a convenience store and called Rowland's office from a pay phone, leaving a message with Rowland's secretary that he "had what Russ needs," and that if Rowland would come by the trailer he would "take care of it."
At approximately 3:00 p.m., Rowland arrived at the trailer and ascended the steps to the front door. When he approached the open door, Keith fired one shot from the defendant's twelve-gauge shotgun, hitting Rowland in the abdomen. Rowland collapsed on the porch outside the front door and began screaming in pain. The defendant then took the shotgun from Keith and attempted to shoot Rowland again, but the gun malfunctioned and would not fire. The defendant then picked up his 30-30 rifle, pointed it at Rowland and, despite Rowland's repeated pleas that the defendant not shoot him, fired the rifle into Rowland's right eye, blowing away a large portion of his head. Thereafter, the defendant told Keith to search Rowland's truck for Rowland's wallet, which Keith found and turned over to the defendant. The defendant subsequently removed $141.00 from the wallet and hid the wallet and money under a couch cushion.
The defendant next asked Keith to help drag Rowland's body into the trailer, but Keith refused. Kline, who had hidden in the bedroom when Rowland approached the trailer, emerged and began cleaning up the blood on the carpet where the defendant had dragged Rowland's body down the hallway. Guin, who had seen Rowland's truck drive by and then heard two gunshots, came over to the trailer to see what had happened. Guin noticed that the front porch was wet and that there was a "big black mark like a trail" going down the hall. Guin also observed Kline on her knees scrubbing at the black mark. Guin asked where the defendant was and Keith pointed to the back of the trailer. Guin walked down the hall and saw Rowland's body on the floor. When the defendant asked Guin to help him move the body, Guin refused. The defendant then picked up the shotgun and began to load it. When the defendant turned toward Guin with the shotgun, Guin ran out the back door and into the wooded area behind the trailer. Guin eventually went to a neighbor's house and called 911 to report the murder.
During this time, one of the defendant's neighbors called 911 to report that she had heard two gunshots coming from the west of her trailer and that one shot had hit her mobile home. She also reported that she saw someone searching Rowland's white pickup truck, which was parked in front of the defendant's trailer. Two deputies responded to the call and searched her trailer for a bullet hole. The deputies eventually walked over to the defendant's trailer and observed that the front porch had recently been washed with a nearby garden hose that was still running. Upon closer inspection, the deputies discovered shotgun wadding, blood, tissue, and bone *211 fragments on the ground near the porch. While trying to determine whether the blood, tissue and bone fragments were of human origin, the deputies received information from headquarters of Guin's report of a homicide at the defendant's trailer. Sheriff's investigators soon arrived and entered the unlocked back door of the trailer to see if anyone inside was injured. Once inside, they discovered Rowland's body, and later his wallet and the $141.00 in cash hidden under the couch cushion. In addition, deputies discovered Rowland's receipt book which contained a receipt made out to the defendant in the amount of $500.00.
Immediately after the shooting, Keith left the trailer and went to a neighbor's house where he stayed until his parents delivered him to the authorities later that evening. In addition, the defendant and Kline left the trailer in Kline's car and drove to the office of a local bondsman, Steve Dement, and then to Dement's house. The defendant informed Dement that there was a dead body in his trailer and Dement instructed the defendant to "go back and check your house out ... [because t]here may not be anybody there." While driving back to the trailer, the defendant was spotted by a sheriff's deputy and taken into custody. The defendant informed the deputy that Kline was still at Dement's house and deputies arrested her without incident. In their several statements, Kline and the defendant maintained that Keith shot Rowland with both the shotgun and the rifle, but Keith maintained that the defendant pulled the trigger of the shotgun as Keith held it and then shot Rowland with the rifle.
On February 13, 1997, a Caddo Parish grand jury separately indicted the defendant and Keith with one count of first degree murder in violation of La. R.S. 14:30. Before the defendant's trial, Keith pled guilty to second degree murder and was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Keith eventually turned state's witness and testified at the defendant's trial that he had indeed fired the first shot, but that the defendant forced him to do so at gunpoint, and that the defendant then shot Rowland in the head with the rifle. The jury found the defendant guilty of first degree murder. Kline pled guilty to accessory after the fact to first degree murder and received the maximum sentence of five years imprisonment at hard labor, with the sentence to run consecutively to a one year sentence she received as an accessory to burglary in an unrelated case.
At the sentencing hearing, the state called Rowland's 17-year-old daughter and 14-year-old son to testify briefly regarding victim impact evidence. The state also called one of Rowland's former tenants in an apparent attempt to introduce evidence of the victim's good character; the witness testified that when she and her husband fell behind on their rent Rowland "would work with us. He [Rowland] would get my husband jobs so we could get some money to pay [the rent]." In addition, the state called Kristee Kline, who described in detail the events of December 30th. The defense presented four witnesses at the sentencing phase, including the defendant's wife, Brandy Irish, who married the defendant five days before the trial began, his mother, his aunt, and a forensic psychologist. In mitigation, the defense focused on the defendant's troubled childhood, low IQ, and exposure to violence in the media. Following this testimony, the jury returned with a death recommendation based on the aggravating circumstance that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery. La.C.Cr.P. art. 905.4(A)(1). The defendant now appeals *212 his conviction and sentence to this Court urging 15 assignments of error.

GUILT PHASE ERRORS

ARGUMENT NO. 3

(Assignment of Error No. 3)
The defendant claims that the trial court erred in allowing an investigator qualified as an expert in crime scene reconstruction, blood splatter, and fingerprint analysis, to offer his opinion that the person who shot the victim in the head "intended" to cause immediate death. During the direct examination of Lieutenant Mark Rogers, the state elicited the following testimony:
STATE: Lieutenant Rogers, based on your experience, your education, and the thousands of death scenes that you've investigated, and your review of all the evidence in this case, what purpose would there be for administering the second shot which was to this victim's head?
WITNESS: The first shot struck the upper abdomen and was what was termed a through-and-through wound. It entered, crossed the abdomen, and exited. The evidence, the direct physical evidence support the fact that for some period after that wound was inflicted he was still at least somewhat mobile, able to move his right arm, at any rate, and apply pressure to the bleeding area of that wound. His head was also inclined somewhat at the second shot. Given the fact that he had suffered a serious shotgun wound to the abdomen and he is inclined on the front porch and his head is inclined upwards at the time, the indications are that he's still alive at the time the second shot was fired. The second shot was fired at the head, the point of entry being the right eye. That indicates that the purpose of the second shot was to cause immediate death.
As a general matter, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert may testify in the form of an opinion. La.C.E. art. 702. Under La.C.E. art. 704, a trial judge may admit expert testimony which "embraces an ultimate issue to be decided by the trier of fact," but the expert witness is not permitted to testify to the ultimate issue of a defendant's guilt. State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254; State v. Hamilton, 92-1919, p. 13 (La.9/5/96), 681 So.2d 1217, 1226 (question posed by prosecution at capital sentencing proceeding to state witness, a pathologist, as to whether murder victim's death was heinous, atrocious, and cruel, and witness's affirmative answer were both improper; doctor's response was not a medical opinion but a legal conclusion that was solely within the jury's province).
The first degree murder statute, La. R.S. 14:30, requires a finding of specific intent and, therefore, a defendant lacking this cannot be found guilty under the statute. Thus, the expert's opinion that the person who shot the victim "intended" to cause immediate death came "exceedingly close to testimony that [in his opinion] the accused was guilty of the crime charged." State v. Deal, supra at p. 7, 802 So.2d at 1261 (citing Pugh, Handbook on Louisiana Evidence Law, 1998, art. 704, p. 442). However, the testimony about which the present defendant complains was little more than the expert's assessment of the likely medical impact of a gunshot wound to the head, and not a legal assessment of the defendant's state of mind at the time of the shooting or an opinion of his guilt or innocence. Further, unlike Deal, the jury *213 in this case had to determine that the defendant was the shooter.
In any event, assuming any error occurred, it was harmless. See Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry [for purposes of harmless-error analysis] is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.") Regardless of what words the expert chose to use in responding to the prosecutor's question, credit should be given to the common sense and fairmindedness of the jurors who understand that the likely purpose of shooting someone in the head at close range with a high-powered rifle is to cause immediate death. State v. Green, 81-2661, 416 So.2d 539, 541 (La.1982) (recognizing "the common sense and fairmindedness of jurors and their ability to distinguish meaningful evidence from unwarranted comments"). The fact that the expert underscored this obvious result in no way prejudiced the defendant. State v. Deal, supra (expert's "testimony regarding the defendant's intent was merely stating the obvious"); (emphasis in original); State v. Sanders, 93-0001, p. 18 (La.11/30/94), 648 So.2d 1272, 1286-1287; State v. Code, 627 So.2d 1373, 1384-1385 (La.1993). This assignment of error lacks merit.

PENALTY PHASE ERRORS

ARGUMENT NO. 10

(Assignment of Error No. 1)
In this assignment of error, the defendant claims that the trial court erred in allowing the prosecutor to question a defense psychologist, Dr. Michael Johnson, about other capital cases in which he and/or his partner, Dr. Mark Vigen, had testified in an attempt to show Johnson's bias against the death penalty. Specifically, he argues that this line of questioning was improper because: 1) it introduced facts and circumstances of other capital cases that were irrelevant to the present jurors' sentencing decision; 2) it attempted to show Dr. Johnson's bias against the death penalty based on his testimony in unrelated capital cases with facts and circumstances different from the present case; 3) it attempted to show Dr. Johnson's bias against the death penalty based on Dr. Vigen's testimony in cases in which Dr. Johnson did not testify and of which he had little knowledge of the facts; and 4) it undermined Dr. Johnson's credibility by associating him with other notorious capital defendants. Specifically, the defendant complains of a nine-page exchange between the prosecutor and Dr. Johnson found at Volume XVI, pages 170-178, of the record.
A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. La.C.E. art. 611(B). The trial court has broad discretion in controlling the examination of witnesses. State v. Coleman, 406 So.2d 563, 566 (La.1981). The right to cross-examine a witness includes the right to question the witness concerning any bias or self-interest attached to the witness's testimony. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Senegal, 316 So.2d 124, 127 (La.1975) (how state witness came about being a state police narcotics agent was not irrelevant, and refusal to permit defense counsel to cross-examine witness in order to establish bias, interest, or corruption was improper, in prosecution for distribution of marijuana); La.C.E. art. 607(D).
In the present case, the prosecutor's questions were designed to elicit Dr. Johnson's possible bias for testifying on the defendant's behalf. The state had the *214 right to question Dr. Johnson about his role as a mitigation expert in other cases to establish a testimonial pattern and thus to expose a possible bias for or against the death penalty. A brief synopsis of the facts and circumstances of those prior cases was necessary to establish a proper context for evaluating the soundness of Dr. Johnson's opinions. Moreover, though Dr. Johnson did not testify in each of the above capital cases, the prosecutor had reason to believe that Dr. Johnson had some knowledge of the facts of those cases and likely formed an opinion whether a death sentence was warranted. The instant record reveals that Dr. Johnson and Dr. Vigen frequently collaborated on psychological evaluations, and that although they both interviewed this defendant, only Dr. Johnson testified at trial. Because Drs. Johnson and Vigen frequently testify in capital cases in Caddo Parish, the prosecutor was well aware that they often work together to prepare psychological evaluations of defendants but that only one of them presents their findings at trial. Accordingly, the prosecutor had a reasonable basis to delve into the opinions of both doctors' work on these previous cases.
At any rate, the colloquy complained of takes up only nine pages of the 217-page sentencing phase, during which the defendant presented four mitigation witnesses. A review of the colloquy reveals that the prosecutor did not recite the facts of the previous cases in any great detail, but rather provided a brief synopsis of the cases. In this context, even assuming that the court erred in allowing the prosecutor to delve too deeply into the circumstances of the other capital cases in exploring the witness's bias and interest, the error was not of such magnitude that it undermines confidence in the jury's sentencing verdict. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (the reviewing court must be able to declare that the error was harmless beyond a reasonable doubt, namely, that no reasonable possibility exists that the error contributed to the verdict). This assignment of error lacks merit.

ARGUMENT NO. 11

(Assignment of Error No. 2)
In this assignment, the defendant argues that the state improperly introduced evidence of the victim's character during the penalty phase. Specifically, the defendant complains of the following testimony: 1) one of the victim's former tenants testified that when she and her husband fell behind on their rent, "He [the victim] would work with us. He would get my husband jobs so we could get some money to pay."; 2) the victim's 17-year-old daughter testified that her mother called her home from a friend's house to inform her of the victim's death; and 3) the victim's 14-year-old son testified that the day before his father died they went hunting together, and that when he turns 25 years old he gets ownership of his father's Harley-Davidson motorcycle.
As a general matter, there are two categories of victim impact evidence that the state may properly introduce: 1) information revealing the individuality of the victim; and 2) information revealing the impact of the crime on the victim's survivors. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (citing Payne v. Tennessee, 501 U.S. 808, 834, 111 S.Ct. 2597, 2614, 115 L.Ed.2d 720 (1991)). In State v. Bernard, 608 So.2d 966, 972 (La.1992), this Court stated that:
[S]ome evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances *215 of the offense or the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime. However, introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision.
Contrary to the defendant's claims, the complained-of testimony falls within the confines set out by Bernard. The three witnesses did not give detailed lists or descriptions of the victim's good qualities, nor did they give a lengthy particularized narration of the emotional and psychological sufferings of themselves or the other survivors. See State v. Taylor, supra at 371 (in finding the victim impact evidence was harmless, the Court noted "surely the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one"). The witnesses' testimony combined composes only five pages in the record of the over 217 page penalty phase. Accordingly, the defendant does not show that this seemingly innocuous testimony introduced arbitrary factors into the jury's sentencing decision. This assignment of error lacks merit.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). In addition, the defendant has submitted a memorandum entitled "Opposition to Capital Sentencing Investigation."
The CSI indicates that the defendant is a white male born on February 12, 1978. He was 18 years old at the time of the offense. The defendant married his childhood sweetheart a few days before his trial began. The defendant's other immediate family includes his mother and a younger brother. Testimony taken at the sentencing hearing reveals that the defendant was born into a turbulent marriage, that during the first few years of the defendant's life his parents were separated at least five times, and that when the defendant was four years old they divorced. The defendant has had little contact with his father since the divorce. During the remainder of his childhood, his mother had numerous husbands and boyfriends, some of whom were convicted criminals that encouraged the defendant to engage in criminal activity.
*216 The CSI further reveals that the defendant quit school when he was 16 years old and that he has an IQ of 81. Moreover, the CSI states that the defendant has never held any significant employment for any length of time, and that he relied on his mother for financial support. The CSI also indicates that the defendant is in good health, takes no medication, and has had no surgeries. Concerning his criminal history, the CSI reveals that he has no juvenile record, but that he has three adult convictions for hit and run, simple robbery, and felony theft.
The defendant's psychiatric evaluation reveals that the defendant has low average intelligence, is aggressive and angry, and prone to overestimate his abilities. In addition, the defendant has a poor self-esteem, an impaired capacity to trust and care for others, and suffers from antisocial personality disorder. According to the UCSR, a psychiatric evaluation was conducted which indicated that the defendant was able to distinguish right from wrong, and was capable of cooperating in his own defense.

Aggravating Circumstances
At trial, the state argued one aggravating circumstance: that the offender was engaged in the perpetration or attempted perpetration of an armed robbery. See La.C.Cr.P. art. 905.4(A)(1). The jury found the existence of this circumstance. Though the defendant argues that the aggravating factor was not supported by the evidence, as explained in the unpublished appendix, this allegation has no merit.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively de-capitalized another death penalty reversed on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Sentence Review Memorandum reveals that since 1976, jurors in the First Judicial District Court have returned a guilty verdict in 31 capital cases, including this one, and recommended the death penalty nine times before this.[2] Of those *217 nine cases in which the juries recommended death, two of those juries found as one of their aggravating circumstances that the offender was engaged in the perpetration or attempted perpetration of an armed robbery, see State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999), and three juries returned a death sentence based on the sole aggravating factor that the offender was engaged in the perpetration or attempted perpetration of an armed robbery. See State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359; State v. Ford, 489 So.2d 1250 (La.1986), vacated, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987).
Moreover, on a statewide basis, cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery or attempted armed robbery. See, e.g., State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (defendant shot and killed two people, and injured two people during the course of an armed robbery); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999) (Broadway's co-defendant); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) (defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Taylor, supra (during armed robbery of the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (defendant, while engaged in the armed robbery of a Church's Fried Chicken, shot and killed one of the employees).
A comparison of the defendant's case with the above-referenced cases, indicates that the death penalty as applied to this defendant is not disproportionate considering the offender and the offense.

DECREE
For the reasons assigned herein and in the unpublished appendix, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La. Code Crim. Proc.art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. *218 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Associate Justice Pro Tempore, participating in this decision.
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] State v. Deal, supra; State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893; State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359; State v.Code, supra; State v. Ford, 489 So.2d 1250 (La. 1986), vacated, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987); State v. Felde, 422 So.2d 370 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).