802 So.2d 1254 (2001)
STATE of Louisiana
v.
Curtis DEAL.
No. 2000-KA-0434.
Supreme Court of Louisiana.
November 28, 2001.
Rehearing Denied January 11, 2002.
*1257 John H. Holdridge, Esq., New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Atty. Gen., Paul Carmouche, Dist. Atty., Catherine M. Estopinal, Esq., Howard M. Fish, Jr., Esq., Shreveport, Counsel for Respondent.
VICTORY, J.[*]
On December 19, 1996, a Caddo Parish grand jury indicted the defendant, Curtis Deal, for the first degree murder of his two-month-old son, a violation of La. C.Cr.P. art. 14:30(A)(5). After trial by jury, the defendant was found guilty as charged. At the conclusion of the sentencing hearing, the jury found the aggravating circumstance that the victim was under the age of 12 and unanimously recommended a sentence of death. La. C.Cr.P. art. 905.4(10). The defendant now appeals to this Court based on 58 assignments of error.[1]

FACTS
In November 1996, the defendant, Curtis Deal, his wife, Jerri, and their two-month-old son, Joshua, lived with Jerri's mother, Peggy Woodruff. Mrs. Woodruff prohibited the consumption of alcohol in her home. However, on the afternoon of November 16, 1996, Mrs. Woodruff left the house to stay with a friend and the defendant and his wife planned an evening together with Jerri's friend, Kim Bowers. Around 4:00 p.m., the defendant and his wife smoked a marijuana joint and started drinking beer around 7:30 p.m. At 9:00 p.m., the defendant left to pick up Ms. Bowers and her two small children.
After putting the children to bed, the defendant and Jerri continued to drink; however, Ms. Bowers did not consume any alcohol. Jerri went to bed around midnight and Ms. Bowers and the defendant stayed up talking. Around 3:30 a.m., Ms. Bowers went to sleep. Shortly thereafter, the defendant went to check on his crying son. After the defendant changed his son's diaper and fed him, the infant continued to cry and spit up milk. The defendant claimed that he cleaned out his son's mouth with two pieces of paper towel and then flung the infant into the crib, banging his head against the railing of the crib. When the defendant noticed the child was not breathing, he woke up his wife and called 911.
At approximately 5:00 a.m. on November 17, 1996, the Caddo Parish 911 service *1258 received a call from the defendant who informed the operator that his infant son was not breathing. Emergency medical technicians ("EMT") arrived shortly thereafter and found the infant lying on the corner of a bed in a cyanotic state. The EMTs immediately started CPR while trying to push air through the child's lungs with an infant air mask. After two failed attempts, the EMTs examined the airway and saw a substance which resembled curdled milk in the back of the infant's throat. Captain Billy Bowers, a paramedic, then used forceps to clear the infant's airway and pulled out a piece of paper about the size of a fingernail, with tiny indentations on it. At this point, Jerri looked at the defendant and asked, "What the hell did you do?" The defendant explained that he had wiped the inside of the baby's mouth with a paper towel after the infant spit up. Captain Bowers then removed a piece of paper about the size of a quarter. Because the remaining piece of paper was tightly packed in the infant's airway, an EMT held the baby still while Captain Bowers pulled out a wad of paper towel which was twisted into a cone shape. A final attempt at ventilating the infant failed and the baby was transported to the hospital.
In the meantime, Captain Bowers contacted the police because the paper towel appeared to have been forced down the infant's airway. When the police officers arrived, Captain Bowers gave Sergeant Lester Robinson a plastic bag which contained the paper towel remnants removed from the infant's throat. All of the adults on the scene were then read their Miranda rights and separated from each other. Officer M.E. Carter and the defendant went into the kitchen, where the defendant made several spontaneous statements explaining how he attempted CPR on his son after he stopped breathing. The defendant also admitted removing beer cans from the house before the ambulance arrived because he was afraid his mother-in-law would be upset at him for drinking in her house. He further stated that he did not mean to "hurt his boy." Upon leaving the scene, police officers collected a roll of paper towels, balled up pieces of paper towel found around the house, beer cans, and marijuana.
Around 6:30 a.m., the defendant, his wife, and Ms. Bowers were driven separately to the police station. Upon their arrival, officers informed the defendant that his son was dead. Once again, the officers advised the defendant of his Miranda rights, which he waived. The defendant began to make an oral statement; however, when he stated that he threw the infant into the crib, the officers interrupted the defendant, readvised him of his Miranda rights, and informed him that he was under arrest for first degree murder. He subsequently waived his rights and made a recorded statement, wherein he stated:
... I go back there in the room, picked the baby up out his bed, feed him his bottle. Okay. He spits up and he starts whining and I took this rag and stuffed it into his mouth and spun it, turned it, like to wash his mouth out, and that was beforelet me back myself upI was trying to make him go to the bathroom, squeezing on his tummy and pushing on his legs, and that's when he spit up take that back. That's when he spit up and then that kind of made me angry, did that. Took the baby, which the baby bed is to my left, took him and just more or less slung him and flung him into the bed and he bounced and hit his head into the side of the railing of the baby *1259 bed. And then I noticed that he wasn't breathing. Took him out and put him on theback onto the bed and I get concerned because I can't get him the breath. I was giving him CPR. Go and get my wife up, said "Jerry, he's not breathing. He's not breathing." She panics, so I went and called 911 and the man tried to tell me what to do, to hold his head back and everything ...
DET. EATMAN: Why did you throw him in the baby bed?
MR. DEAL: Because he kept bawling and stuff like that and I was trying to get him to go to sleep and it was late and I was wanting to go to bed myself and I was drinking, and when I been drinking I sometimes loseI got a temper.
DET. EATMAN: So you got mad at the baby.
MR. DEAL: Yeah, and Idid like that and it bounced, bam, hit that side of that rail, bounced up on the bed. Sir, I didn't kill that boy just to be killing him. I didn't. That's my son.
. . .
DET. EATMAN: Didn't you think it was going to cause a problem for the baby, you leaving a paper towel in his mouth?
MR. DEAL: Well, that's the thing about it, I didn't know it was in his mouth. I didn't know.
DET. EATMAN: You stuck it in there.
MR. DEAL: I know I stuck it in there though, but I had a paper towel, two of them together, stuck in there and turned it like this and pulled it back out, chunked it in the garbage like that
. . .
On December 19, 1996, a Caddo Parish grand jury returned an indictment charging the defendant with first degree murder. At trial, the state presented the testimony of emergency personnel, investigating officers, the defendant's wife and her friend, Ms. Bowers, and the forensic pathologist who performed the autopsy on the victim. The defense urged the jury to return a verdict of manslaughter; however, the jury subsequently found the defendant guilty of first degree murder.
At the sentencing hearing, the state did not call any witnesses. For the defense, the defendant testified on his own behalf and Dr. Mark Vigan, a clinical psychologist, presented the defendant's family history and his findings with respect to the defendant's personality and IQ. Following the penalty phase, the jury, finding the sole aggravating circumstance urged by the state, (i.e., that the victim was under the age of 12) returned a recommendation of death. The trial court formally sentenced the defendant to death by lethal injection on August 10, 1999.

GUILT PHASE ERRORS

Sufficiency of the Evidence

Assignments of Error Nos. 5 and 43
The defendant claims that the jury convicted him on insufficient evidence. Specifically, he argues that the state failed to establish beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm. Instead, the defendant contends that the facts only support a verdict of manslaughter.
In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to *1260 the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984).
To convict the defendant of first degree murder, the state needed to prove (1) that the defendant had the specific intent to kill or inflict great bodily harm, and (2) that the victim was under the age of twelve. La. R.S. 14:30(A)(5). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Williams, 383 So.2d 369, 373 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981). Manslaughter is a homicide which would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. La. R.S. 14:31(A)(1). The elements of "sudden passion" and "heat of blood" are mitigatory factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. State v. Lombard, 486 So.2d 106, 110-111 (La.1986); State v. Tompkins, 403 So.2d 644, 647 (La.1981). Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self control. See Reporter's Comment to La. R.S. 14:31; State v. Mayfield, 186 La. 318, 172 So. 171, 172 (1937). Manslaughter is also a homicide committed without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of any intentional misdemeanor directly affecting the person. La. R.S. 14:31(A)(2)(a). A battery is an "intentional misdemeanor directly affecting the person." State v. Humphrey, 412 So.2d 507, 513 (La.1982).
At trial, the defense suggested that the drunken defendant acted out of frustration when he threw his infant son into the crib and argued that poor parenting was to blame for the paper towel lodged in the child's throat. However, testimony from the state's witnesses indicated that considerable force was required to cause the instant injuries, either of which could have resulted in the child's death. First, Dr. George McCormick, a forensic pathologist, testified that given the pliable nature of an infant's head, "a lot of force must be applied" to cause the head injury suffered by the instant victim which fractured his skull and caused a hemorrhage around his brain. Dr. McCormick also indicated that the paper towel appeared to have been forced down the child's throat in a twisting and pushing manner which would have shut off the infant's airway. Captain Bowers further stated that indentations found on the paper towel suggested that the paper towel was forced down the child's throat and maintained that the bag used to perform CPR on the child could not have caused the paper towel to lodge in the child's airway. According to Captain Bowers, the paper towel was packed so tightly that the EMTs had to hold the infant still while he removed it with forceps because on previous attempts the child's body had moved across the bed. Here, the force necessary to inflict the head injury, the manner in which the paper towel was pushed into the child's airway, and the extent of the instant injuries support a finding of the intent element. Moreover, the combination of both injuries severely *1261 undercuts the defendant's claims of accident and carelessness. In fact, the defendant's own statement, in which he callously describes "chunk[ing]" and "flip[ping]" the baby into the crib, makes clear that his actions were designed to silence the baby who kept him awake by crying. In addition, the defendant failed to inform medical personnel of how the child was injured although he admitted, in his statement, that he became nervous after throwing the child into the crib. Finally, the testimony at trial established that the victim was two-months-old, well within the age limit of R.S. 14:30(5). Considering the evidence presented in this case, the jurors did not act irrationally when they rejected the defendant's manslaughter defense. See State v. Jones, 95-1457 (La.App. 3 Cir. 5/8/96), 677 So.2d 493, 494-495 (specific intent to cause death or serious bodily harm was established by statement that defendant threw infant into crib and that infant's head hit crib rails, coupled with expert testimony that infant died from skull fracture and brain hemorrhage which resulted from use of force). These assignments of error lack merit.

Expert Opinion Evidence that Defendant had Specific Intent to Kill or Inflict Great Bodily Harm

Assignment of Error No. 3
This assignment of error concerns the state's direct examination of its forensic pathologist, Dr. McCormick, who testified that, in his expert opinion, the fatal injuries suffered by the victim, a skull fracture and a blocked airway, illustrated a specific intent to kill or inflict great bodily harm. When presented with a hypothetical scenario that mimicked the facts of this case, Dr. McCormick gave his opinion that specific intent to kill or inflict great bodily harm was present.
Defendant argues to this Court that the doctor's testimony was tantamount to an opinion that the defendant was guilty of the crime charged. La.C.E. art. 704 regulates opinion testimony given by experts on an ultimate issue:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
The first degree murder statute, La. R.S. 14:30, requires a finding of specific intent. Therefore, a defendant lacking this specific intent cannot be found guilty under the statute, and the defendant's specific intent was the key contested issue in this case. An expert witness is not permitted to testify to the ultimate issue of defendant's guilt. See State v. Jones, 558 So.2d 546 (La.1990); La.C.E. art. 704. This is true even if the opinion is couched in terms of a hypothetical situation. See State v. Code, 627 So.2d 1373, 1384 (La. 1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).
In testifying that the defendant acted with specific intent when he hurled the baby into the crib and twisted the paper towel down the infant's airway, the doctor perhaps came "exceedingly close to testimony that [in his opinion] the accused was guilty of the crime charged." See Pugh, Handbook on Louisiana Evidence Law, 1998, art. 704, p. 442 (citing State v. Steward, 681 So.2d 1007, 1011-1012 (La.App. 1 Cir. 9/27/96))(criticizing the First Circuit opinion which held admissible in an attempted rape prosecution testimony by the victim that she believed the defendant intended to rape her); La.C.E. art. 704, *1262 official comment (c) ("The law continues... to prefer the more concrete to the less concrete, and as the subject matter of an opinion approaches an ultimate issue the presentation of the more concrete becomes more helpful, and conclusory testimony generally less so.") (paraphrasing State v.. Wheeler, 416 So.2d 78, 82 (La. 1982)); see also State v. Hamilton, 92-1919, p. 13 (La.9/5/96), 681 So.2d 1217, 1226, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997) (question posed by prosecution at capital sentencing proceeding to state witness, a pathologist, as to whether murder victim's death was heinous, atrocious, and cruel, and witness's affirmative answer were both improper; doctor's response was not a medical opinion but a legal conclusion that was solely within the jury's province). Thus, we find that the trial court erred in allowing Dr. McCormick to testify that the defendant acted with specific intent to kill or inflict great bodily harm.
However, finding error under La. C.E. art. 704 does not end the analysis. First, this Court must consider whether defense counsel properly preserved the error for review. Under State v. Taylor, failure to make a contemporaneous objection to an error at the guilt phase of a capital trial prevents this Court from reviewing the error. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996). The goal of the contemporaneous objection rule of La.Code Crim. Proc. Art. 841(A) and La.Code Evid. Art. 103 is to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which he either could have avoided or corrected at the time or should have put an immediate halt to the proceedings. Id. at 368.
As set forth above, the only objection made by the defense to Dr. McCormick's testimony was on grounds that the doctor's opinion exceeded the scope of his medical expertise and amounted to nothing more than ungrounded speculation about the defendant's subjective mental state at the time of the offense. Counsel did not object on grounds that even if qualified to express an opinion with regard to the mental state which accompanied the defendant's acts, Dr. McCormick was usurping the role of the jury as the factfinder. It is settled that a new basis for an objection may not be asserted for the first time on appeal. State v. Stoltz, 358 So.2d 1249, 1250 (La.1978). Therefore, by asserting a new basis for objecting to Dr. McCormick's testimony that the defendant acted with specific intent for the first time on appeal, defense counsel did not properly preserve this error for review. Therefore, this assignment of error lacks merit because the defendant is procedurally barred from asserting this basis for the objection for the first time on appeal.
However, even if the defense had preserved this claim for review, we find the error to be harmless. To find harmless error, the Court must be able to declare a belief that the error was harmless beyond a reasonable doubt and to state that the verdict rendered was "surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1286-1287, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); State v. Code, supra at 1384-1385.
The defendant maintains that this error cannot be harmless because the primary *1263 point of contention in the case was whether the defendant specifically intended to kill or cause great bodily harm to the victim and the substance of Dr. McCormick's testimony was essentially an expression of his opinion that the defendant had such intent. On the other hand, the state urges the Court to find the error harmless, arguing that the jury's verdict was inevitable given the amount of force used by the defendant to inflict the victim's injuries.
Here, the facts show the defendant threw his two-month-old son into his crib with such "considerable force" that the baby's skull was cracked, resulting in a brain hemorrhage. Furthermore, Dr. McCormick indicated that "a lot of force has to be applied" because of the pliability of an infant's head. In addition, the state also presented the jury with the defendant's statement in which he describes becoming angry with his son after the child spit up his milk and how he "just more or less slung him and flung him into the bed and he bounced and hit his head into the side of the railing of the baby bed." The defendant indicated that he "chunked" the infant "because he kept bawling and stuff" and that the defendant "want[ed] to go to bed." He also admitted to having a bad temper when he drank and stated that he was "mad at the baby" and was acting "mean" when he "flipped" the infant into the bed. The defendant further failed to inform emergency medical personnel of how the child was injured although he later admitted, in his statement, that "when I seen him bounce up and hit that, bang, like that, that's when I got nervous and maybe, when he hit that bed like that too like that, that thing [the paper towel] might have lodged down further." Accordingly, the defendant's statement made clear that the victim's head injury was not accidental and further suggested that the defendant wanted to hurt his son because the infant's crying made him angry and kept him awake. As a result, it was reasonable for the jury to conclude that the defendant's actions were intentional from his own statement.
Similarly, while allowing the doctor's testimony indicating that the placement of the paper towel in the infant's throat appeared intentional was erroneous, Dr. McCormick properly testified that the paper towel was applied in a twisting and pushing motion which would have shut off the infant's airway. Furthermore, this testimony corroborated Captain Bowers's earlier testimony in which he stated that he contacted the police because the paper towel appeared to have been "forced down into the airway" based on the "indentations" he observed on the paper towel. Captain Bowers further testified that the baby could not have "sucked it down" because the paper towel was "packed in the airways so tight" and maintained that the air from the bag used to perform CPR on the child could not have forced the paper towel down into the infant's airway. In fact, when Captain Bowers initially tried to remove the paper towel, the infant moved across the bed because the paper towel was packed in the infant's throat so tightly. At this point, Captain Bowers ordered the EMTs to hold the infant's body still while he extracted the remaining wad of paper towel from the baby's throat. Certainly the combination of two life-threatening injuries would have caused the jury to reject the defense theory of accidental injury and manslaughter. Thus, in the absence of Dr. McCormick's opinion concerning the defendant's intent, the jury surely could have found that the defendant acted with specific intent to kill or inflict great bodily harm based on the manner in which the infant's airway was obstructed and *1264 that the infant was deliberately "slung" into his crib, causing his head injuries. Dr. McCormick's testimony regarding the defendant's intent was merely stating the obvious. See State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637 (unpub'd app'x at 17-18), cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999) (question posed to pathologist as to whether perpetrator shot the victim with specific intent to kill was improper but harmless given the defendant's confession and testimony that the defendant had ordered the murder).
Moreover, we have reviewed the closing arguments of the state in its entirety and note that the prosecution strenuously argued the facts of the case as establishing the defendant's specific intent, and hardly mentioned Dr. McCormick's opinion on the issue of intent. Further, the trial court gave an admonitory instruction on the evaluation of expert testimony[2]. Consequently, the trial court's admission of Dr. McCormick's testimony as to his opinion of the defendant's intent was clearly erroneous, but, viewed in light of the very substantial testimony that the defendant, at the very least, had specific intent to inflict great bodily harm, the verdict was surely unattributable to the error. This assignment of error lacks merit.

PENALTY PHASE

Expert Opinion Testimony that Defendant had Specific Intent to Kill or Inflict Great Bodily Harm

Assignments of Error Nos. 3, 17 and 27
The defendant contends that the prosecutor improperly questioned Dr. Mark Vigan, the defense psychologist, about the defendant's intent when he asked, "And Mr. Deal did specifically intend to kill and inflict great bodily harm on his son Joshua when he killed him, did he not?" The doctor replied, "I think so. His behavior is, you know, we can't read intention, we can only infer intention from behavior. But I certainly agree with you." The prosecutor then added, "Well, that's what the jury charge says that you can infer intention?" and Dr. Vigan stated, "Well I believed it all along." Shortly thereafter, the prosecutor repeated Dr. Vigan's testimony during his cross-examination of the doctor, stating, "[Y]ou're convinced he has specific intent to kill or inflict great bodily harm." The defendant claims that this testimony, coupled with the reintroduction at the penalty phase of Dr. McCormick's testimony, constitutes reversible error.
Despite the lack of defense objection during Dr. Vigan's testimony reproduced above, the defendant now asserts that the defense objection to Dr. McCormick's testimony sufficed to place the trial court on notice of the instant claim and preserve any error. However, as discussed above, defense counsel did not object to Dr. McCormick's testimony on the grounds that he improperly expressed an opinion on the guilt of the defendant. Thus, as the objection did not preserve the issue of Dr. McCormick's testimony for review on that ground, neither did it put the court on notice of the instant claim relative to Dr. *1265 Vigan, and thus did not preserve the defense's present complaint for review, i.e., the usurpation of the jury's factfinding role by an expert opinion addressed to the ultimate issue in the case.
As this case was tried before this Court's decision became final in State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 180-81, reh'g denied, (La.7/2/99)[3], cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (contemporaneous objection rule will apply to penalty-phase errors as well as guilt-stage errors in capital cases heard after the date of decision), the failure of counsel to object does not bar this Court's review of defendant's claim. However, the contemporaneous objection issue has considerable importance for the defendant in terms of the appropriate standard of review for addressing this penalty phase error. If counsel had properly preserved the issue for review, the state would bear the burden of showing, as with any other properly preserved claim, that the error was harmless beyond a reasonable doubt. Chapman v. California, supra. However, because the defense did not properly preserve the issue for review, as the error involves the penalty phase of a capital trial, the Court must determine as a matter of La. S.Ct. Rule 28 whether the error interjected an arbitrary factor into the proceedings, i.e., "an error of such magnitude that it undermines confidence in the jury's sentencing verdict, essentially the same kind of error that would support the prejudice prong under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) for claims of ineffective assistance of counsel." State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 928, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). "Arbitrary factors" are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed "wantonly or freakishly" or for discriminatory reasons. Id.; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 21-22, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998) (citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).
Just as with Dr. McCormick's testimony at the guilt phase regarding the defendant's specific intent, the reintroduction of that testimony at the penalty phase, as well as the admission of Dr. Vigan's testimony at the penalty phase, were erroneous. However, this testimony regarding the defendant's specific intent did not inject an arbitrary factor into the determination of the sentence, as specific intent was entirely relevant in the jury's determination.
Further, the prosecutor only reintroduced all the evidence from the guilt phase into the penalty phase and, during his closing argument during the penalty phase, the prosecutor never referred to either experts' testimony that the defendant acted with specific intent. The defense closing argument did not refer to any evidence reducing the defendant's moral culpability in the offense as a basis for sparing his life; instead, defense counsel *1266 asked the jury for forgiveness and suggested that imposing a life sentence would leave them with a clear conscience. In addition, the defendant took the stand in an effort to invoke any residual doubt in the jurors' minds about his specific intent to kill. During direct examination, the defendant indicated that he understood and accepted the jury's verdict although he denied intentionally killing his son and described the instant offense as "accidental." However, in spite of the defendant's testimony, the jury unanimously rejected the defendant's version of the crime and voted to impose the death penalty. Under these circumstances, we find no injection of an arbitrary factor under Rule 28. Consequently, these assignments of error lack merit.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report[4] ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI").
The CSI indicates that the defendant is a white male born on May 3, 1963. He was 33 years old at the time of the offense. The defendant has two brothers and one sister. The defendant admitted to touching his sister sexually when they were children; however, he indicated that the inappropriate behavior ended when she was a teenager and the defendant further described the acts as consensual. As an adult, the defendant was estranged from his family. The defendant has been married three times; all of his marriages have ended in divorce. His first marriage ended after two days. The defendant's second marriage resulted in the birth of a daughter; however, the relationship ended after his wife suspected the defendant of sexually abusing their child. The defendant was married to the mother of the instant victim but she divorced the defendant after his incarceration for the instant offense.
As for his educational and work background, the defendant quit school after completing the tenth grade. His work history reflects that he worked for Dairy Barns and Piggly Wiggly for an unknown period of time before his employment at Midas Muffler for ten years. He subsequently worked as a welder for five years but was terminated for smoking marijuana at work. The defendant was employed as a welder for General Electric for two years before his instant arrest. The defendant has no history of prior convictions.
The defendant's psychiatric evaluation reveals that the defendant suffers from a moderate depressive condition, alcohol dependence, and a minor neurological deficit of unknown origin. According to the defendant, he began drinking to the point of *1267 intoxication when he was 17 years old and started using marijuana at the age of 18. The defendant also experimented with Valium, cocaine, methamphetamines, and cigarettes dipped in embalming fluid. According to the UCSR, a psychiatric evaluation was conducted which indicated that the defendant was able to distinguish right from wrong and was capable of cooperating in his own defense.

Passion, Prejudice, and other Arbitrary Factors
The defendant contends that eight elements injected passion, prejudice, arbitrariness, and caprice into the proceedings based on: (1) the state's rebuttal argument during the penalty phase; (2) the state's introduction of unadjudicated juvenile offenses allegedly committed by the defendant; (3) the state's improper cross-examination of Dr. Vigan; (4) the state's highly inflammatory "victim impact" argument; (5) the trial court's erroneous sentencing instructions; (6) pervasive prosecutorial misconduct; (7) the state's improper cross-examination of the defendant; and (8) the trial court's improper granting of challenges for cause exercised by the state and its denial of defense cause challenges with respect to the prospective jurors' views on capital punishment.
All of these factors were treated in depth above and in the unpublished appendix in the individual assignments of error.

Aggravating Circumstances
At trial, the state argued one aggravating circumstance: that the victim was under the age of twelve. See La.C.Cr.P. art. 905.4(10). The jury found the existence of this circumstance. Although the defendant urges this Court to find this aggravating circumstance unconstitutional, this claim was rejected supra. See unpublished appendix, Assignment of Error No. 47.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Sentence Review Memorandum reveals that since 1976 jurors in the First Judicial District Court have returned a guilty verdict in 31 capital cases, including this one, and recommended the death penalty eight times before this.[5]
*1268 However, given the scarcity of comparable cases in Caddo Parish, it is appropriate for this Court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a statewide basis. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1030-1031, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). A statewide review of cases reflects that jurors find the death penalty appropriate in cases in which the victim is a young child[6]. *1269 The majority of these offenses involve the commission of aggravated rape, or another enumerated felony, i.e., Deboue, in which the murders were committed during an aggravated burglary and Deruise, in which the murder was committed during an armed robbery. Although the state argued in Connolly that the victim died during the course of an aggravated rape, the evidence arguably did not support a finding of that circumstance beyond a reasonable doubt. In this case, no accompanying sexual offense was proved. The absence of such an underlying crime is not critical, however. Cf. State v. Lavalais, 95-0320, pp. 59-61 (La.11/25/96), 685 So.2d 1048, 1059, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997) (although juries in Louisiana have historically favored life to death for contract killings, death is not a disproportionate penalty for the offense.) For example, the Court upheld the death sentences imposed pursuant to La.C.Cr.P. art. 905.4(10) in Langley, based on the method of the crime by which the defendant garroted the victim after manually strangling him, and Sepulvado, based on the severity of the physical abuse, the length of time over which the abuse occurred, and the horrible nature of the lethal injury.
Here, the state presented testimony concerning the considerable force used to injure the infant in two different ways. First, the defendant closed off the child's airway by twisting a paper towel down the infant's throat. Shortly thereafter, the defendant, irritated with the child's crying, threw the baby into a crib causing a skull fracture and brain hemorrhage. The evidence of the method of the crime and the extent of the victim's injuries, coupled with the fact that the victim was two months old leads to the conclusion that death is not a disproportionate penalty in this case.
In State v. Jones, supra, the defendant was charged with second degree murder and subsequently convicted in a bench trial of killing his two and one-half-month old son by throwing him into a crib with such force that the infant died two days later of a massive skull fracture and brain damage. When the child lapsed into unconsciousness, the defendant contacted 911; however, he did not inform medical personnel of how the child was injured. In his statement to police, the defendant explained that he tossed the victim into the crib because the child's crying irritated him. Id., 677 So.2d at 494.
The instant case is distinguishable from Jones because the cause of the victim's death here is attributable to two different injuries inflicted on the infant by the defendant. In any event, a death sentence is not necessarily disproportionate because a defendant in a factually similar case received a life sentence. State v. Eaton, 524 So.2d 1194, 1212 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). As such, the death sentence imposed here is not disproportionate.

DECREE
For the reasons assigned herein and in the unpublished appendix, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving *1270 notice from this Court under La.Code Crim. Proc. Art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
CALOGERO, C.J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissenting.
In a criminal case, the law does not permit an expert witness to testify as to his opinion on the ultimate question the jury must decide.[1] Therefore, the trial court's admission of expert testimony as to whether defendant had the specific intent to kill his child was clearly erroneous.
With respect to the sentencing phase, it would have taken only one of twelve jurors to disagree with his colleagues and effect a sentence of life imprisonment rather than a death sentence. For this reason, I find it impossible to conclude that an error of this magnitude is harmless. I cannot conclude that the punishment chosen is completely unattributable to the trial court's error. Therefore, I dissent from the majority opinion in this case only with regard to affirming the death sentence. The defendant's conviction is properly affirmed, and he should face a sentence of life imprisonment.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Associate Justice Pro Tempore, participating in this decision.
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] The trial court read the following instruction:

Experts are persons who are learned in a particular science and they are permitted to express their opinion upon scientific matters in issue. But such experts are not called into court for the purposes of deciding the case. You, the jurors, are the ones who, in law, must bear the responsibility of deciding the case. The experts are merely witnesses and you have the right to either accept or reject their testimony and opinions in the same manner and for the same reasons for which you may accept or reject the testimony of other witnesses in the case.
[3] The instant case was tried on June 21, 1999, after Wessinger was decided but before the Court denied rehearing. See La.C.Cr.P. art. 922 ("[a] judgment rendered by the supreme court or other appellate court becomes final when the delay for applying for a rehearing has expired ... [or when] the supreme court denies [a] writ.")
[4] The defendant complains that the CSI fails to comply with Section 3 of Rule 28 because the report "includes numerous extraneous, prejudicial, unconstitutional and irrelevant matters, is perfunctory, lacks adequate indicia of reliability, and is wholly deficient." However, the defendant's failure to brief this claim fully provides this Court with nothing to review.
[5] State v. Irish, (appeal pending); State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Cooks, supra; State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999); State v. Davis, supra; State v. Code, supra; State v. Felde, 422 So.2d 370(La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); State v. Ford, 489 So.2d 1250 (La.1986), cert. denied, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987).
[6] In State v. Loyd, 489 So.2d 898 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987), the twenty-five-year-old white defendant kidnapped a three-year-old white female victim, raped her vaginally and anally, and drowned her in a ditch. On October 29, 1993, the sentence was vacated by the United States Fifth Circuit on grounds of ineffective assistance of counsel at penalty phase. The state was ordered to sentence the defendant to life imprisonment or retry the sentencing phase. That prosecution is now underway. See State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321 (commutation instruction mandated by La.C.Cr.P. art. 905.2(B), 1995 La. Acts No. 551, may apply to the defendant's resentencing penalty trial although it was not in effect at the time of the offense.)

In State v. Brogdon, 457 So.2d 616 (La. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985), the 19-year-old defendant and a 17-year-old accomplice lured the 11-year-old victim into their car, drove her to an isolated spot, raped her repeatedly, forced oral sex, and then tortured her by beating her with a brick, shoving sharp objects into her vagina, and cutting her with a broken bottle. The defendant, who was borderline mentally retarded, was under the influence of alcohol at the time.
In State v. Copeland, 530 So.2d 526 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989), the defendant and his co-defendant, George Brooks, repeatedly raped an eleven-year-old boy and shot him several times. See also State v. Brooks, 505 So.2d 714 (La.1987), rev'd, 94-2438 (La.10/16/95), 661 So.2d 1333.
In State v. Deboue, 552 So.2d 355 (La. 1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990), during the course of an aggravated burglary, the defendant slashed the throats of his six and 11 year old victims allowing them to drown in their own blood.
In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996) the defendant, over a three day period, tied a rope around his six-year-old stepson's neck, threatened to hang him, beat him, put his head in the toilet and flushed, refused to feed him, kicked him from one room to another, and, finally, put him in a tub of scalding water which produced third degree burns over sixty percent of the victim's body.
In State v. Connolly, 96-1680 (La.7/01/97), 700 So.2d 810, the defendant, a Sunday school teacher, slashed the throat of his nine-year-old victim behind the church after church services. The victim was found alive, in a pool of blood by his father, but died shortly after arriving at the hospital. The state argued that the victim was sexually abused by the defendant based upon the dilation of the victim's anus, although no other evidence supported this claim.
In State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, the defendant choked a six-year-old boy with his hands and then garrotted the victim with nylon line and stuffed a dirty sock into the victim's mouth. On remand from this Court, the district court quashed the grand jury indictment on grounds of racial discrimination in the selection of grand jury forepersons in East Baton Rouge. The appeal is pending.
In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, the defendant shot and killed an eleven-month-old infant during an armed robbery.
[1] La.Code Evid. art. 704 provides as follows:

Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces and ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.