GREMILLION, Judge.
In this case, the defendant, George Elaire, Jr., was convicted by a jury of the second degree murder of Christopher Landry. He was subsequently sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. Defendant now appeals his conviction alleging as error insufficient evidence, the exclusion of res gestae statements of the victim as inadmissible bad character evidence of the victim, and the failure of the trial court to charge the jury regarding the crime of manslaughter. For the following reason, we affirm.
SUFFICIENCY OF EVIDENCE
Defendant contends the evidence presented in the case was insufficient to convict him of second degree murder. He claims the evidence did not conclusively prove that he was responsible for the stabbing and, if it did, • it was done without provocation sufficient to make the homicide a manslaughter.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See *662 Graffagnino, 436 So.2d at 563, citing State v. Richardson, 425 So.2d 1228 (La. 1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.
State v. Freeman, 01-997, pp. 2-3 (La. App. 3 Cir. 12/12/01), 801 So.2d 578, 580.
 Second degree murder is defined as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. ,La.R.S. 14:30.1(A)(1). “When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense.” State v. Hall, 606 So.2d 972, 973 (La.App. 3 Cir.1992), writ denied, 93-0051 (La.11/11/94), 644 So.2d 385, citing State v. Garcia, 483 So.2d 953 (La.1986).
The altercation resulting in the stabbing death of Christopher Landry occurred at the Food ‘N Fun in Breaux Bridge, Louisiana. A number of witnesses testified about the killing, but their versions of events vary. Ahmed Trice testified that he spent the most time with Landry on the night in question and gave his account of the stabbing, identifying Defendant as the killer. Trice did not know why Defendant started a fight with Landry or why he stabbed him other than the fact that the two had a minor disagreement over tire rims earlier in the evening. Trice said he heard Defendant say, “I’m stabbing the m — -f-in the heart,” and then “By the way, I’m riding on Dayton rims.” He also said he saw a knife in Defendant’s hánd. After Defendant left the. scene, Trice vyent to check on Landry and observed a one-to-two inch hole in Landry’s shirt, in the left middle of his chest over the breast area.
Nicole Anthony testified that she was talking to Landry at the Food ‘N Fun on the night in question when a man came towards Landry and said, “I have something for you straight through your heart.” According to Anthony, the man then hit Landry in the chest, but she said that the hit was not “straight on with the fist.” | ¡¡Anthony could neither identify the perpetrator nor could she tell if he had anything in his hand when he struck Landry.
Bernestine Menard also testified; however, she stated that she did not see the entire fight between Landry and Defendant, did not see anything in Defendant’s hands, and did not see Defendant strike Landry in the chest area. She testified that she heard Defendant say, “I stabbed the ‘M-F’ in the heart,” after the fight was over;
Bernice Alexander was also called as a witness and stated that she was in the parking lot at the time of the incident. She testified that she saw an earlier argument in the parking lot of the club between Landry, and “some other guys,” but she did not know what the argument was about. Alexander later observed Landry talking to Anthony at the Food ‘N Fun. She then heard arguing and saw Landry and “the other guys” fussing about “rims, tires.” She testified that she then saw Defendant stab Landry one time in the chest and observed a knife approximately six inches in length in his hand. According to Alexander, when Defendant stabbed Landry, he said, “I stabbed him dead in the f-g heart.”
Finally, Kayla Baltazar testified. She stated that Landry and Anthony were talking when some men in a truck pulled up parallel to the passenger’s side of Anthony’s car. She testified that Landry asked one of the men why he hit Anthony’s car with his door. According to Baltazar, at that point, Landry and the man started fighting. She could not identify the other man and could not see if he had a knife. *663 When asked if' the other man struck Landry from straight on, she indicated that he hit him from the side. She testified that she knew Landry had been stabbed because she saw the hole in his shirt and blood from his wound after the fight.
14Pr. Emil Laga performed an autopsy on Landry and testified that he died as a result of the stab wound just above the nipple that penetrated the lung and heart and that there were two other non-fatal stab wounds in his chest.
On the other hand, Defendant’s witnesses gave different versions of the event. Defendant’s friend of approximately five years, Christopher Deamer, testified that, on the night in question, he and Defendant were walking toward their car after a night club closed talking about rims. Deamer testified that a man appeared “out of nowhere” and said, “Well, aw f — k some Daytons. That’s old. Nobody do — nobody ride that no more. I ride original.” Deamer said that there was no confrontation or anything initiated by the person other than the statement, and he and Defendant walked away.
According to Deamer, when he and Defendant arrived at the Food ‘N Fun, they parked far enough behind the other cars so that they did not block them and Defendant got out of the truck and started walking to the store. Deamer said a. man grabbed Defendant, bear-hugged him, ran with him, and slammed him against the back of the truck. Deamer could not identify Landry as that man. Deamer claimed that approximately six to seven people went over to break up the fight and the guy started jumping around saying, “Oh, f-f — this, fill kill all y’all m-f-. Y’all don’t know me. I’m just getting out the pen.” Deamer - testified that he and Defendant then got in their vehicle and left.
Rodney Hulin, Defendant’s cousin, accompanied him and Deamer on the night in question. Contrary to Deamer’s testimony, Hulin testified that they parked parallel to the building and blocked the cars parked in front of the store. Hulin |Ktestified that the man, who put Defendant in a bear hug, was bigger than Defendant and attacked him first. We note that Dr. Laga testified Landry was 6'1" and weighed 180 pounds; Defendant’s booking sheet listed his weight at 210 pounds. Hu-lin estimated Defendant’s height as 5'10." Hulin claimed that he hit the man because he was bigger than Defendant. According to Hulin, three to four other people assisted him in getting the man off of Defendant. Hulin testified that, after the fight was broken .up, he, Deamer, and Defendant left the scene, Hulin said that Landry and a big crowd of people were still fighting when they left, but, on cross-examination, he testified that he did not actually see Landry fighting at that time.
Karlon Woods, a close friend of Defendant’s, testified that before the man bear-hugged Defendant, she saw them exchange “a couple of words.” When shown Landry’s picture, Woods denied ever seeing him before. It was Woods’ testimony that, Landry was “jumping up in the parking lot” after the fight was over and Defendant left. She said that Landry started walking and about six or seven people jumped on him and started fighting with him. She said that she then heard shots and jumped in her car and left.
Finally, none of the witnesses called on behalf of Defendant saw him with a knife or other weapon.
We find that the evidence presented in this case, viewed in a light most favorable to the prosecution, is sufficient to prove beyond a reasonable doubt that Defendant committed the crime of second degree murder. The jury obviously made *664 a credibility call as to which witnesses it believed and they chose to believe the State’s witnesses. The -jury reasonably found beyond a reasonable doubt that | (¡Defendant had the specific intent to kill Landry and that the crime was not committed in self-defense. Accordingly, this assignment of error is without merit.
RES GESTAE STATEMENTS
Defendant contends the trial court erred in excluding res gestae statements made by Landry which prevented him from having a fair trial. He argues that he had a right to have the jury consider whether Landry was threatening him at the time of the altercation and whether Landry’s statements -corroborated the testimonies of his defense witnesses, who said that Landry was the aggressor. Defendant further argues that the admissibility of this evidence is mandated by the constitutional principles that require all exculpatory evidence be considered by the trier of fact.
Defendant refers to the testimony of two witnesses, who testified that Landry screamed,- “I just got out of the penitentiary, y’all don’t know me,” while he was in the parking lot of the Food ‘N Fun. Defendant contends both references were stricken by the trial court in response to the State’s objection. He is-mistaken.
Deamer testified in narrative form regarding his observations upon arriving at the Food ‘N Fun. Near the end of his narrative, he stated that Landry started jumping around when he and Defendant were pulled apart and saying, “ ‘Oh, ff — this. I’ll kill all y’all m-f-. Y’all don’t know me. I’m just getting out the pen.’ And after that, we got in our truck and left.” After this testimony was elicited, the following occurred:
BY THE STATE:
Judge, may we approach? May we approach?
. |7(The following proceedings were conducted at a bench conference, as follows:)
BY THE STATE:
Judge, he made reference to the victim’s character there. I don’t know if [Defense Counsel] instructed him to do that or if the defendant did that, but he’s in a narrative. I would ask [Defense Counsel] to go into a question and answer period. I don’t want any admonition, but I don’t want any more reference to the victim’s prior record.
BY THE COURT:
All right.
(END OF BENCH CONFERENCE)
BY THE COURT:
i’ll sustain the objection. And please do a question and answer with the witness, please.
The foregoing reveals that the State did not ask the trial court for an admonition or that the response be stricken. Rather, it asked that there not be any further reference to Landry’s prior record. Thus, the testimony was not excluded and could have been considered by the jury.
However, during Woods’ testimony, she stated that “[Landry] was just jumping up, saying, you know, “F — y’all. I kill all y’all. I just got out the penitentiary,” after Defendant and his friends left the scene. The State objected without giving reasons and the trial court sustained the objection and instructed the jury to disregard the statement as it was unresponsive. The response made by Woods was to the question, “And at the time that they left, what was this individual (Landry) doing?” We find that Woods’ response was responsive; therefore, we shall consider Defendant’s further argument.
*665 IsDefendant now contends that the testimony was admissible under the “res ges-tae” exception to the hearsay rule. La. Code Evid. art. 808(3) states:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
(3) Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s testament.
Accordingly, Landry’s statement, made during an excited state shortly after the fight broke up, would fall within this exception to the hearsay rule. Additionally, this evidence would be admitted into evidence under subsection (A)(2) of La. Code Evid. art. 404, which provides, in pertinent part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
[[Image here]]
(2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history • of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on' the part of the victim in order to introduce |9evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert’s opinion as to the effects of the prior assaultive acts on the accused’s state of mind is admissible; or
(b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]
However, we find that the error is harmless. “To find harmless error, the Court must be able to declare a belief that the error was harmless beyond a reasonable doubt and to state that the verdict rendered was ‘surely unattributable to the error.’ ” State v. Deal, 00-0434, p. 9 (La.11/28/01), 802 So.2d 1254, 1262 (citations omitted). Even though the jury was instructed to disregard this statement, it was allowed to consider virtually the same statement attributed to Landry in Deamer’s testimony. Based on that fact, and other substantial evidence against Defendant, we cannot find that the verdict rendered in this case was “surely unattributable to this error.”
Thus, this assignment of error is without merit.
*666 JUSTIFICATION AS DEFENSE TO MANSLAUGHTER
Defendant claims the trial court erréd in holding that justification is not a defense to a manslaughter charge and in refusing to instruct the jury that it is a defense to manslaughter. During the jury charge conference, Defendant complained that the jury instructions regarding second degree murder were followed by the justification charge and then the manslaughter charge. Defendant contends that the justification charge should follow the manslaughter charge arguing that justification is a defense not only to second degree murder, but also to manslaughter. The trial court held:
|inWell, I think it’s confusing to the jury. But the basis of the manslaughter instruction is that the person is not justified in the manslaughter except for the fact that it’s in sudden passion or heat of blood. So I think the self-defense— you’re asking about the self-defense instruction after manslaughter. I don’t believe that that’s applicable.
We agree. Manslaughter is defined in La.R.S. 14:31(A) as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1; or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
One may envision a set of circumstances under Paragraph A(2) where justification may be a defense to manslaughter, however, the misdemeanor/manslaughter situation does not exist under the facts of this case. Pursuant to Paragraph A(l), justification cannot exist because an element of •manslaughter is sudden passion or heat of blood caused by provocation. Sudden passion or heat of blood vitiates the requisite specific criminal intent to kill or commit great bodily harm required in a homicide. Therefore, the sudden passion or heat of blood which would deprive an actor of the reason necessary to ■ form the specific In criminal intent would also deprive the actor of the reason necessary to justify self-defense. In this regard, we disagree with our colleagues in the fifth circuit, who have held, “Self-defense or lack thereof is not an element of manslaughter, but, rather, a defense to such a charge.” State v. Necaise, 466 So.2d 660, 667 (La.App. 5 Cir.1985).
Further, the trial court gave instructions defining second degree murder, and then gave a complete and comprehensive instruction on justification followed immediately by the manslaughter charge. We believe that is the proper order to give those instructions in order to highlight the defense of justification to the more serious charge of second degree murder. To give the charge in any other order may confuse *667 and confound the jury. If the jury wished to consider justification as a defense to either second degree murder or manslaughter, it was properly instructed on that defense and, more importantly, was not specifically instructed that the defense did not apply to manslaughter. The jury returned a verdict of second degree murder, obviously rejecting the defense of justification for that offense. Under these circumstances, Defendant was not prejudiced and the error is not reversible.
CONCLUSION
Defendant’s conviction and sentence are affirmed.
AFFIRMED.